IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EDWARD BURGESS,

    Plaintiff,
 v.

GARY BOUGHTON, DANIEL WINKLESKI,   OPINION & ORDER
JOLINDA WATERMAN, TANYA BONSON,
SONYA ANDERSON, CARRIE SUTTER, ELLEN RAY,   16-cv-846-jdp
JAMES LABELLE, EMILY DAVIDSON,
CATHY A. JESS, LEBBEUS BROWN,
REBECCA FELDMAN, and BETH EDGE,

    Defendants.[1]

---

Pro se plaintiff Edward Burgess is a prisoner in the custody of the Wisconsin Department of Corrections (DOC) currently housed at the Wisconsin Secure Program Facility (WSPF). He is proceeding on Eighth Amendment deliberate indifference claims, claims under the Rehabilitation Act, and state-law medical malpractice claims concerning defendant prison officials' alleged failure to provide adequate treatment for his plantar fasciitis and bone spurs. Burgess has moved for reconsideration of my order denying preliminary injunctive relief. Dkt. 153. Three groups of defendants—Tanya Bonson; Rebecca Feldman; and the remaining defendants, whom I'll refer to as "the state defendants"—have moved for summary judgment in their favor on all of Burgess's claims. Dkt. 77; Dkt. 94; Dkt. 100. Burgess opposes, and also asks me to exclude some of defendants' evidence. Dkt. 134. I will grant defendants' motion for summary judgment on Burgess's claims under the Eighth Amendment and the Rehabilitation

---

[1] I have updated the caption to reflect the fact that Cathy A. Jess has replaced Jon Litscher as the secretary of the Wisconsin Department of Corrections. *See* Fed. R. Civ. P. 25(d).

Act. With the federal-law claims out of the case, the basis for federal jurisdiction is gone, so I will exercise my discretion to dismiss Burgess's state-law medical malpractice claims without prejudice.

PRELIMINARY MATTERS

I will address three preliminary matters before turning to the parties' motions.

First, on July 30, the court received a letter from Burgess asking for the chance to try his case to a jury. Dkt. 161. In the letter, Burgess says that he was receiving legal help from other inmates but that when they asked him for money and he refused, they "sabotaged" his case. *Id.* Burgess does not offer any further details about the alleged sabotage, and I do not take him to be asking for the opportunity to update his filings with new or corrected information.

Second, Burgess has filed only partial responses to defendants' summary judgment motions. In some situations, I allow pro se plaintiffs the opportunity to supplement incomplete opposition filings, usually when the plaintiff fails to respond to the defendant's proposed findings of fact. I need not do so here. Burgess makes clear in a February 15, 2018 letter that he chose not to file an opposition brief "due to tight time constraints and the pile of filings plaintiff had to respond to." Dkt. 130-1, at 2. Instead, he focused his efforts on responding to defendants' proposed findings of fact, which he did in accordance with the court's procedure for summary judgment motions. *See* Dkt. 130; Dkt. 131; Dkt. 160. I will not second-guess Burgess's strategic decision to focus his efforts on the facts, rather than the law. From his submissions, I can determine what facts are genuinely disputed. That's all that's necessary for me to analyze defendants' summary judgment motions, so I will not offer him an unrequested

second chance to respond. Nor will I consider his failure to file a brief a waiver of his opposition to defendants' motion.

Third, defendants have filed a copy of the summary judgment order in *Burgess v. Lenz*, No. 16-cv-1147, Dkt. 48 (E.D. Wis. Apr. 23, 2018), a similar case filed by Burgess concerning the availability of shoes at the Green Bay Correctional Institution (GBCI), where he was housed before he was transferred to WSPF. Dkt. 158-4. Defendants argue that *Lenz* "is factually indistinguishable from this case and, in fact, is the predecessor to the case before this Court." Dkt. 157, at 5. This raises the doctrine of issue preclusion—that is, the idea that the resolution of an issue in previous litigation is conclusive of the issue in subsequent litigation with the same party. A court can raise the doctrine on its own where, as here, it clearly applies. *See Reed v. Mackey*, 669 F. App'x 307, 308 (7th Cir. 2016).

Under federal common law, issue preclusion applies when the party against whom the issue was resolved had (1) a full and fair opportunity to litigate the issue in the previous suit and (2) "a meaningful opportunity to appeal the resolution of the issue." *DeGuelle v. Camilli*, 724 F.3d 933, 935 (7th Cir. 2013). Here, Burgess had a full and fair opportunity to litigate the issues raised at summary judgment in *Lenz*. He was given the opportunity to file a response to the defendants' summary judgment motion and received several instructions and warnings about how he must do so, but he submitted only a two-page response brief, a two-page affidavit, and four pages of exhibits in response. *See* Dkt. 158-4, at 2. And Burgess had a meaningful opportunity to appeal the resolution of the issues raised in *Lenz*: he sought review by the Seventh Circuit Court of Appeals. The district court denied his motion for leave to proceed *in forma pauperis* on appeal and warned him that he would have 30 days to request the Seventh Circuit's review of that denial or to pay the filing fee. *See Lenz*, 16-cv-1147, Dkt. 57 (May 25,

3

2018). He failed to do so, and so the Seventh Circuit dismissed his appeal for failure to pay the filing fee. *See Lenz*, 16-cv-1147, Dkt. 58 (July 26, 2018).

Burgess's failure to comply with procedural requirements does not shield him from the application of issue preclusion. The purpose of the doctrine is to conserve judicial resources, promote the finality of judgments, avoid inconsistent results, and ensure that a party may not relitigate issues already decided against it in prior litigation. *DeGuelle*, 724 F.3d at 936. Those purposes would not be served if issue preclusion were inapplicable if the party failed to take advantage of the opportunities available to it. So issue preclusion is applicable here, which means that everything that the court decided in *Lenz* applies here. I will deem all of the facts recited in *Lenz* (which concern events arising immediately before the events at issue in this case) to be undisputed for purposes of this case.

## UNDISPUTED FACTS

The following facts are undisputed except where noted.

### A. The parties

Defendants are prison officials. At the times relevant to Burgess's claims, Cathy A. Jess was the deputy secretary of the DOC. She has since become the secretary. Several defendants worked within the WSPF administration: Gary Boughton was the warden, Daniel Winkleski was the deputy warden, and Carrie Sutter was the financial program supervisor of the business office. Several others worked in the WSPF health services unit: Jolinda Waterman was the health services manager, Sonya Anderson, Beth Edge, and Rebecca Feldman were nurse clinicians, and Tanya Bonson was a nurse practitioner working through a contractor at WSPF. Lebbeus Brown was a WSPF unit manager. Several other defendants worked with inmate

complaints at WSPF and at the DOC level: Ellen Ray was a WSPF institution complaint examiner; James LaBelle was a regional nursing coordinator with the Bureau of Health Services, and Emily Davidson was a DOC corrections complaint examiner.

Plaintiff Edward Burgess is a prisoner currently housed at WSPF. He has suffered from plantar fasciitis, a painful foot condition, for decades. Burgess's claims in this suit concern his ability to obtain certain shoes from WSPF that could accommodate his orthotics to treat his plantar fasciitis. I'll discuss the DOC's shoe policies broadly before turning to Burgess's individual treatment.

**B. DOC policies**

Two DOC policies are at issue in this case. The first, Policy 309.20.03, concerns inmate personal property and clothing. It states that inmates may purchase personal property, including shoes, from approved vendor catalogs (unless prior approval for purchase from an outside vendor has been obtained). Dkt. 85-1, at 3–4. Each purchased item must not exceed $75 in value. Inmates may not purchase more than two pairs of shoes per year. Inmates are also provided with a pair of "state-issued" shoes—WSPF issues a high-top, lace-up shoe.

The second, Policy 300.07, concerns medically necessary items. It requires institutions to establish a special needs committee and states that "[p]rescribing practitioners shall refer items to the committee . . . for review of special needs rather than write orders for specific items." Dkt. 81-3, at 2. It states that inmates "will not be given special approval to purchase medical . . . items which are not already approved through the DOC property rules." *Id.* It offers further guidance on shoes, specifically:

> - HSU [Health Services Unit] provides customized special medical orthopedic shoes (ones that require special customization and fabrication that are made from a mold or plastic cast specifically for the individual at an orthotic

5

- company). Customized orthopedic shoes shall be replaced as determined necessary when showing signs of heavy wear, or no longer cover the foot. . . .

- HSU does not issue, purchase, or authorize special purchases if the inmate is able to wear regular shoes (common shoes that can be purchased from a store or catalog). Inmates should be encouraged to purchase their own personal shoes. If a patient is not able to wear the State supplied footwear due to a significant medical condition (i.e. diabetic with foot ulcers or need for Velcro shoes due to a [stroke]) and provision of an alternative off the shelf shoe is necessary, the facility shall provide an alternative. These cases are to be very limited and determined on a case by case basis through the established committee . . . review.

- HSU will not get involved with ordering extra pairs of personal shoes. Property guidelines shall be followed. Tennis shoes shall not be ordered by the HSU. Inmates . . . can order tennis shoes according to the property rules.

*Id.* at 7. The WSPF Special Needs Committee is composed of defendants Waterman, Winkleski, Sutter, and Anderson.

## C. Burgess's medical treatment

Burgess has had plantar fasciitis, a painful foot condition, for more than 20 years. He was also diagnosed with diabetes in January 2016. (Burgess states that he doesn't have diabetes, but he points to no evidence to support his belief. Regardless, whether or not he has diabetes is not a material issue in this case.)

DOC records indicate that in 2013, while incarcerated at the Fox Lake Correctional Institution, Burgess was prescribed custom orthotics for his foot pain and was provided with "extra depth" athletic shoes to accommodate the orthotic inserts. Dkt. 102-1, at 38. He also accumulated several pairs of his own personal high tops.

6

Burgess was transferred to GBCI in June 2015. Soon after, he asked Mary Sauvey, a GBCI doctor, for new orthotics. She contacted outside orthopedic specialists, who recommended that Burgess receive a diabetic shoe to wear with his new orthotics. Diabetic shoes provide additional support to prevent foot problems commonly associated with diabetes. At this point, Burgess had not been diagnosed with diabetes, but according to the orthopedic specialist, the extra support of a diabetic shoe would address Burgess's foot pain. Burgess refused to wear the diabetic shoes, claiming they were too big for him. He asked for a pair of high-top shoes, instead. Sauvey told him that high tops weren't medically necessary and would not address Burgess's foot pain. She made two notes in Burgess's medical records explaining that Burgess would benefit from diabetic shoes, not high tops:

> Memo to patient: high top shoes not medically indicated. Please have pt. sign refusal for diabetic shoes w/ custom made orthotics for plantar fasciitis.
>
> . . . .
>
> Has high topped tennis shoes w/ custom made orthotics (2 pair). Recently refused orthotic referral. Wants to keep current high topped tennis shoes (for plantar fasciitis). Not medically indicated for tennis shoes to be high topped. I recommend diabetic shoes w/ traditional metatarsal support.

Dkt. 102-1, at 41, 42.

In the spring of 2016, Sauvey obtained a new pair of diabetic shoes for Burgess. Burgess refused them again, so she again discontinued the order for special shoes. She also ordered gel insoles for him, to provide extra cushioning for his feet. In May, Burgess's personal high tops were confiscated from him because they were not allowed under GBCI's shoe policy without a medical order for special shoes.

On August 30, 2016, Burgess was transferred from GBCI to WSPF. On September 11, he wrote a letter to Waterman. In the letter, he introduced himself, explained that he has "serious chronic . . . plantar fasciitis" and had been given "state issued shoes" recommended by an "orthopedic specialist" but that GBCI officials took them away, leaving Burgess without "any shoes that fit" and "barely" able to walk. Dkt. 81-1, at 326. Burgess explained that he wanted "to order some new shoes" and that he had notified the HSU "at least six times" about this issue, but still hadn't been seen. *Id.* Waterman responded to Burgess's letter the next day, explaining that according to his medical records, "high top shoes are not medically indicated" and Burgess refused the diabetic shoe that he was offered at GBCI, and therefore his medical order for shoes was "discontinued." *Id.*

On September 15, Douglas Schmid, a WSPF doctor, met with Burgess and entered the following order in Burgess's medical records:

> Call [GBCI] & see if [Burgess's] shoes & orthotics can be sent [to WSPF]. It would benefit him to get high top Nike shoes given thickness of current orthotics, if this can be accomplished within footwear restrictions. If not he should apply thru "special needs" application.

Dkt. 81-1, at 50. It appears that at some point after this, Burgess obtained at least one pair of high tops not from an approved vendor catalog (specifically, a pair of Timberland boots). It's not clear whether they were sent from GBCI or obtained elsewhere.

Schmid explains in a declaration that his "intention was to secure permission for Mr. Burgess to be permitted to purchase the shoes for himself." Dkt. 83, ¶ 8. He also explains that "any tennis shoe that had a removable insert and would allow enough depth to accommodate [Burgess's] orthotic would have been sufficient" to treat Burgess's plantar fasciitis; a Nike high top, specifically, "was not medically necessary" but happened to be "the

8

type of shoe that Burgess specifically requested at that visit." *Id.* ¶¶ 10–11. But Burgess states in a declaration that Schmid "told [Burgess] that based on [Burgess's] medical record and [Burgess's] own account, . . . the Nike high top shoes were considered a medical necessity and that he would recommend them accordingly." Dkt. 132, ¶ 34. Schmid also explains in his declaration that the "footwear restrictions" he referred to in his order are the DOC policies discussed above.

The next day, Waterman made two annotations next to Schmid's order: "Pt refused shoes offered at GBCI 6/27/16" and "to special needs." Dkt. 81-1, at 50.

On September 22, Waterman told Burgess that HSU would not order high tops for him. She gave him two options: (1) accept the diabetic shoes originally offered to him at GBCI or (2) purchase personal shoes through an approved vendor catalog. She suggested that he purchase size 11 shoes. Burgess refused both options; he wanted HSU to buy him high tops from a source other than an approved vendor catalog.

The next day, the WSPF Special Needs Committee met to discuss Burgess's shoes. The committee determined that Schmid's September 15 order did not require them to provide special shoes for Burgess because the orthopedic specialists recommended a diabetic shoe, not high tops, and because Burgess had the option of purchasing personal shoes through an approved vendor catalog that would accommodate his orthotics. So they sent Burgess a letter informing him that his "request for shoes to accommodate orthotics" was denied. Dkt. 81-1, at 181.

Burgess continued to complain of foot pain and ask that HSU purchase shoes for him. In response to each of Burgess's more than 60 letters, Boughton, Waterman, or another HSU staff member would reiterate the two options Waterman originally provided to Burgess: accept

9

the diabetic shoes or purchase personal shoes through an approved vendor catalog. Burgess also filed several grievances, each of which was dismissed based on the health care providers' assessment that special shoes were not medically necessary for Burgess and that diabetic shoes would adequately address his foot pain. The officials who took part in reviewing and dismissing Burgess's grievances included Ray, LaBelle, and Davidson.

Burgess was also seen in the HSU and provided with pain medication, ice, an order allowing him to attend dayroom for recreation, and physical therapy. (The dayroom order was later cancelled because it interfered with other inmates' ability to use the dayroom.) Burgess was also taken to a podiatrist, who recommended cortisone injections, but Burgess refused them, explaining that they hurt too much. Waterman and Feldman told Burgess that his foot pain was caused by his size 9½ Timberland boots, which were too small for him—he should have been wearing a size 11½ shoe instead. (According to Burgess, Timberland boots "run a size larger than ordered." Dkt. 132, ¶ 22.)

By April 2017, Burgess had obtained new orthotics and a pair of size 10½ Nike personal shoes, in addition to the Timberland boots. But Burgess could not wear these shoes during visitation—only state-issued shoes or medical shoes, such as diabetic shoes, are allowed during visitation. On April 18, he complained to Edge that he "had to wear seg shoes to" visitation the day before, causing his back to hurt. Dkt. 81-1, at 13. He asked to be allowed to wear personal shoes at all times. Edge forwarded his request to "HSM" (presumably Waterman, the health services manager). *Id.* at 14.

On April 21, Nurse Bethel asked Brown to give Burgess a pair of state-issued high-top, lace-up shoes to accommodate Burgess's orthotics—presumably so that Burgess could wear his orthotics to visitation. Brown provided a pair of size 12 state-issued shoes to Burgess. The next

10

day, Burgess told Bethel that the orthotics didn't fit in the size 12 shoes. Bethel determined that the orthotics fit in a size 14, so she gave a pair of size 14 shoes to Burgess. Burgess refused them because they were "too big and he threw his back out last time he wore shoes that were too big." *Id.* at 12. Burgess returned his orthotics and elected to wear the size 12 shoes with two pairs of socks (presumably without orthotics) to visitation, instead.

ANALYSIS

Before considering defendants' motions for summary judgment, I must address Burgess's motion to exclude the expert testimony of Schmid, Waterman, Bonson, and Feldman. Dkt. 134. Each of these individuals is listed as a "non-retained expert" in at least one defendant's expert disclosures. *See* Dkts. 74–76. And each submitted a declaration in support of at least one defendant's motion for summary judgment. *See* Dkt. 81; Dkt. 83; Dkt. 99; Dkt. 102. Burgess argues that these individuals may not offer expert testimony because they "cannot be expected to be even minimally impartial" and because Waterman, Bonson, and Feldman "are not orthopedic specialists." *Id.* at 1, 2.

I will deny Burgess's motion for two reasons. First, I do not take these witnesses to present expert testimony concerning orthopedics. Each witness is what's known as a hybrid fact-and-expert witness, that is, a witness who was personally involved with the facts of the case and offers opinions formed during the events at issue, not in response to litigation. *See Ind. Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 370 (7th Cir. 2017). Such testimony is generally admissible as factual or lay opinion testimony. *Id.* The only arguably "expert" opinions that these witnesses offer concern treatment for Burgess's foot pain, which does not appear to be a topic on which only an orthopedic specialist could opine. And

defendants' summary judgment motions don't hang on whether Burgess's diagnosis or recommended treatment options are correct (the type of issue on which expert testimony might be useful); rather, the crux of the motions is whether defendants acted reasonably, given the medical records and doctor's orders they were aware of. In other words, even if I struck the expert-opinion portions of the declarations offered by defendants, it would not affect the outcome of defendants' motions.

Second, the mere fact that these witnesses are not impartial does not preclude them from testifying. Burgess is not an impartial witness, either, but his testimony is admissible. At trial, it would be up to the jury to consider witnesses' potential bias when weighing the testimony. When considering defendants' summary judgment motions, I must view the evidence in the light most favorable to Burgess, as the nonmoving party, but I may not strike evidence simply because it comes from a potentially biased source. So I will deny Burgess's motion to exclude expert testimony.

That brings me to defendants' motions for summary judgment. Again, at this stage, I must view the evidence in the light most favorable to Burgess. But Burgess also bears the burden of coming forward "with specific facts showing that there is a genuine issue for trial." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

1. **Eighth Amendment claims**

I begin with Burgess's Eighth Amendment claims. Burgess contends that Boughton, Winleski, Waterman, Bonson, Anderson, Sutter, Brown, Feldman, Edge, Ray, LaBelle,

Davidson, and Jess were deliberately indifferent to his plantar fasciitis. To succeed on a deliberate indifference claim, Burgess must show that he has a serious medical need, that the defendant was aware of that need, and that the defendant was deliberately indifferent to it. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Defendants concede that plantar fasciitis is a serious medical need and that they were aware of Burgess's plantar fasciitis. The sole question here is whether each defendant was deliberately indifferent to Burgess's plantar fasciitis.

Courts "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Id.* Deliberate indifference is more than mere negligence; it is found only where "a medical professional's treatment decision [is] 'such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.'" *Id.* at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996)). Such a departure might occur when a medical professional "refuses to take instructions from a specialist" or "persists in a course of treatment known to be ineffective." *Id.* at 729–30. "[M]ere disagreement with a doctor's medical judgment" is insufficient to establish deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Here, Burgess has not produced evidence showing anything more than a mere disagreement with his doctors' medical judgment. The evidence indicates that Burgess's medical providers believed that a pair of diabetic shoes would accommodate his orthotics and help address his plantar fasciitis. They tried to provide Burgess with those shoes, but he refused. They then provided Burgess with alternatives: they recommended other shoes that would accommodate his orthotics, which he could purchase from an approved vendor catalog; they

13

provided him with pain medications, ice, and physical therapy exercises; they recommended cortisone shots. The one thing they were not willing to do was to purchase personal high tops for Burgess. Viewing the facts in the light most favorable to Burgess, those high tops would have accommodated his orthotics and provided relief from his foot pain, just like the diabetic shoes. In other words, they were equivalent alternatives. But the Eighth Amendment does not require medical professionals to select, from equivalent alternatives, the treatment option that the prisoner prefers. *See Berry*, 604 F.3d at 441. Here, the medical professionals selected the treatment opinion that aligned with prison policy: diabetic shoes. That selection was reasonable. The mere fact that Dr. Schmid attempted to allow Burgess his preferred treatment option, the high-top shoes, does not undermine the other medical professionals' judgment, especially when Schmid made clear that Burgess was only to be allowed shoes in accordance with the DOC's policies.

And even if there were reason to question Burgess's medical providers' treatment decisions, the remaining defendants—Winkleski, Jess, Sutter, Anderson, Ray, LaBelle, Davidson, Boughton, and Brown—did not personally provide care to Burgess and therefore were entitled to defer to the medical providers' judgment as long as they did not have reason to believe that those providers were mistreating him. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). They would have had no reason to think so. So I will grant summary judgment in defendants' favor on the Eighth Amendment claims.

2. **Rehabilitation Act claims**

I allowed Burgess to proceed on a claim under the Rehabilitation Act against Jess, the current DOC secretary, in her official capacity. To establish a violation of the Rehabilitation Act, Burgess must prove that he is a qualified person with a disability, that the DOC accepts

federal funds, and that the DOC denied him access to a program or activity because of his disability. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). A failure to provide reasonable accommodations for a disability amounts to a denial of access if the lack of accommodation prevents the prisoner from accessing programs or activities. *See Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012). There's no dispute that Burgess's plantar fasciitis qualifies as a disability or that the DOC accepts federal funds, so the sole question is whether he was denied access to any program or service because of his plantar fasciitis.

There's no evidence that Burgess was denied access to any program or service at WSPF because of his plantar fasciitis. Burgess's theory is that he was in so much pain, due to the lack of proper shoes, that he could not leave his cell to eat or attend other activities. But as discussed above, Burgess had shoes available to him; he refused to wear them. He was also provided with pain medication and other options for pain relief. So the DOC provided reasonable accommodations to Burgess. The Rehabilitation Act does not require more. So I will grant summary judgment in Burgess's favor on his Rehabilitation Act claim, too.

### 3. Medical malpractice claims

I allowed Burgess to proceed on Wisconsin medical malpractice claims against Feldman, Edge, Bonson, Anderson, and Waterman. These are state-law claims, over which this court may exercise supplemental jurisdiction. *See* Dkt. 42, at 6. But because I am granting summary judgment for defendants on all of the federal claims, I may decline to exercise supplemental jurisdiction over the state-law claims and dismiss them without prejudice. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999).

Based on the record developed so far, I do not believe that Burgess's malpractice claims are strong ones. But defendants' argument that nurses aren't subject to medical malpractice

lawsuits under Chapter 655 is not a strong one, either—I determined that nurses are subject to common-law medical malpractice lawsuits in *Smith v. Hentz*, 15-cv-633, 2018 WL 1400954, at *3 (W.D. Wis. Mar. 19, 2018). As defendants acknowledge, the record pertaining to the malpractice claim is not well developed, due in part to Burgess's pro se status, which has hindered his development of the expert evidence he would likely need to prevail on these claims.

So in the interest of "judicial economy, convenience, fairness, and comity," *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997). I will decline to exercise jurisdiction over Burgess's medical malpractice claims and dismiss them without prejudice. If Burgess has a good-faith basis for asserting these claims, he may refile them in state court, subject to the requirements and limitations of Wisconsin Statutes section 893.55.

ORDER

IT IS ORDERED that:

1. Plaintiff Edward Burgess's motion to exclude expert testimony, Dkt. 134, is DENIED.

2. Defendants' motions for summary judgment, Dkt. 77; Dkt. 94; Dkt. 100, are GRANTED. Plaintiff's state-law medical malpractice claims are DISMISSED without prejudice to plaintiff refiling the claims in state court.

3. The clerk of court is directed to enter judgment accordingly and close this case.

Entered August 15, 2018.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge